MARCELLA A. CONNOLLY v. THE NICOLLET HOTEL
AND OTHERS.

95 N. W. (2d) 657.

February 27, 1959—No. 37,180.

---

[6]King v. Schultz, 231 Minn. 569, 43 N. W. (2d) 278.

374

*G. M. Sullivan, Charles R. Murnane,* and *Murnane & Murnane,* for appellant.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *William T. Egan,* for respondent.

MURPHY, JUSTICE.

Action by Marcella A. Connolly against The Nicollet Hotel, a copartnership, and Alice Shmikler, as trustee of Joseph Shmikler, and others, doing business as The Nicollet Hotel, for the loss of the sight of her left eye alleged to have been caused by defendants' negligence.

The accident occurred about midnight June 12, 1953, during the course of the 1953 National Junior Chamber of Commerce Convention which had its headquarters at The Nicollet Hotel in Minneapolis. It was occasioned when plaintiff was struck in her left eye by a substance falling from above her as she walked on a public sidewalk on Nicollet Avenue adjacent to the hotel.

The 1953 National Junior Chamber of Commerce Convention, Inc., was joined as a defendant in the action, but at the close of the testimony a verdict was directed in its favor. The jury returned a verdict against The Nicollet Hotel copartnership, which will hereinafter be designated defendants, in the sum of $30,000. This is an appeal from an order of the trial court granting judgment for such defendants notwithstanding the verdict. On appeal plaintiff contends that defendants were negligent in failing to maintain order and control the conduct of their guests with respect to persons using the sidewalk adjacent to the hotel building and that hence the court erred in granting judgment notwithstanding the verdict.

The evidence, presented entirely by plaintiff inasmuch as defendants rested at the conclusion of plaintiff's case, established the following: The easterly side of The Nicollet Hotel is adjacent to Nicollet Avenue. The hotel lies between Washington Avenue to the north and Third Street to the south. It is a 12-story building, but on the Nicollet Avenue side it

is limited to eight stories in height. It has a capacity of approximately 490 sleeping rooms on the upper eleven floors. There are no other high buildings in its vicinity. Just south of the hotel on Nicollet Avenue is The Nicollet Hotel garage also operated by defendants. On the east side of Nicollet Avenue opposite the hotel were two 4-story buildings. To the south of these is a parking lot.

Nicollet Avenue in this block is about 50 feet in width. The sidewalks adjacent to it on each side are about 10 feet in width from curb line to building line. At the time of the accident that half of the west sidewalk nearest to the hotel was blocked off by a barricade from the Nicollet Avenue hotel entrance south for about 95 feet, leaving an area about 5 feet in width for pedestrian traffic for such distance. The hotel entrance on Nicollet Avenue is about midway between Washington Avenue and the entrance to the hotel garage.

At the time of the accident there was nothing unusual about the weather. Plaintiff, in company with one Margaret Hansen, had just left the hotel via its Nicollet Avenue entrance and was walking southerly toward Third Street on the west side of Nicollet Avenue. When she had traveled approximately six to ten steps from the canopy extending over such entrance, she observed two people walking toward her. She then heard a noise which sounded like a small explosion and saw something strike the walk in front of her. She observed that one of the persons approaching her was struck on the left shoulder by some substance. She then exclaimed, "We better get off this sidewalk, * * * or somebody is going to get hit." Immediately thereafter she glanced upward and was struck in the left eye by a substance she described as a mud-like substance or a "handful of dirt." Margaret Hansen testified that she also saw the substance falling from eye level to the sidewalk a step or two in front of her. She described the sound made by the striking object as explosive and accompanied by a splattering. The only place from which the article might have fallen from above was the hotel building.

The blow which struck plaintiff caused her to lose her balance but not to fall. Her knees buckled and she was caught by Margaret Hansen and held on her feet. Following the blow, she stated that she could not open her left eye and the left side of her face and head became numb,

and her shoulders, hair, and the left side of her face were covered with dirt. A dark substance which looked like mud was found imbedded in her left eye. After the accident the assistant manager of the hotel attempted to remove a "mud like substance" from plaintiff's eye by using a cotton applicator. As a result of the foregoing accident, plaintiff lost the sight of the injured eye.

As stated above, the 1953 National Junior Chamber of Commerce Convention occupied a substantial portion of the hotel at the time of the accident. In connection therewith various delegates and firms maintained hospitality centers there where intoxicants, beer, and milk were served to guests and visitors. Two of such centers were located on the Nicollet Avenue side of the building.

The assistant manager of the hotel on duty at the time of the accident and in charge of maintaining order had received notice that water bags had been thrown from the hotel during the previous days of the convention. The night engineer testified that on the Hennepin Avenue side of the hotel he had observed liquor and beer bottles and cans on the sidewalk and described the accumulation in this area as greater than he had ever witnessed during the 18-month period he had been employed at the hotel. He also testified that he had found cans and beer bottles upon the fire escape at the third-floor level during the convention.

Arthur Reinhold, an employee of the garage, had been informed that objects had fallen or been thrown from the hotel and that a window screen had fallen from the building, first striking the barricade covering the sidewalk next to the garage, and then falling upon a pedestrian. He also was advised that ice cubes had been thrown from the hotel and that a bottle had been thrown or had fallen therefrom during the course of the convention.

Since in reviewing an order upon a motion granting judgment notwithstanding the verdict we are required to view the evidence in the light most favorable to the verdict, it is material to point out these additional facts: A floral shop was maintained on the premises where potted plants were sold. During the course of the convention a mule was stabled in the lobby of the hotel, and a small alligator was kept on the fourth floor. There was firing of guns in the lobby. Broken bottles and broken glass

were found on the sidewalk near the garage adjacent to the building so that it was necessary to clean the sidewalk near the garage as frequently as twice a day during the course of the convention. The doorman at the hotel was equipped with a shovel and broom which he used for this sidewalk maintenance. Property of the hotel was damaged on the third, fourth, fifth, sixth, eighth, ninth, tenth, and eleventh floors. The window of the office of the credit manager was broken. From the testimony of the executive housekeeper of the hotel the damage consisted of wet carpets, broken chairs, broken screens, molding torn loose from connecting doors, and walls spotted with liquor and water. The inspection of the building made after the accident indicated that there were three missing window screens, mirrors pulled off the walls in bathrooms, light fixtures were broken, signs were broken, hall lights were broken, exit lights were broken, the bowl in the men's washroom was torn off the wall, holes were drilled through door panels, and 150 face towels had to be removed from service. Broken glass and bottles were found on landings and stair wells, a condition which existed almost every night at all floor levels. It became apparent to the general manager of the hotel on June 11, 1953, the day prior to the happening of the accident to the plaintiff, that the disorderly behavior of the hotel guests created a hazard to the defendant's property. He issued the following memorandum to his staff:

"WE HAVE ALMOST ARRIVED AT THE END OF THE MOST HARROWING EXPERIENCE WE HAVE HAD IN THE WAY OF CONVENTIONS, AT LEAST IN MY EXPERIENCE! WHEN WE BECAME INVOLVED AND SAW WHAT THE SITUATION WAS, WE HAD NO ALTERNATIVE BUT TO PROCEED AND 'TURN THE OTHER CHEEK.' HOWEVER, IT INVOLVES CERTAIN EXPENSES THAT I DO NOT PROPOSE TO FOREGO WITHOUT AT LEAST AN ARGUMENT—AND MAYBE LEGAL SUIT.

\* \* \* \* \*

"I, OF COURSE, AM SPEAKING OF ANY DAMAGE, WHICH FOR THE MOST PART WILL BE REPORTED BY THE HOUSEKEEPING DEPARTMENT. HOW-EVER, THAT I MAY DRAW UP A COMPREHENSIVE CASE, PLEASE HAVE THE INFORMATION IN MY OFFICE NOT LATER THAN NOON, FRIDAY. WE WILL,

INCIDENTALLY, START TO TAKE DOWN ALL SIGNS, ETC., AT 9:00 AM, FRIDAY MORNING."

In granting the defendants' motion for judgment notwithstanding the verdict, the trial court was of the view that there was no evidence which would support a finding that the defendants had knowledge of the particular risk of injury to a member of the public and that by the exercise of ordinary care they could not know that a guest's conduct would naturally result in injury to others. The trial court apparently agreed with the defendants' contention that prior to the plaintiff's injury there was no time to ascertain the location of the room from which the object fell or from which it was thrown and to evict therefrom the person or persons responsible therefor. Bruner v. Seelbach Hotel Co. 133 Ky. 41, 117 S. W. 373, 19 Ann. Cas. 217.

■ It is generally agreed that a hotel owner or innkeeper owes a duty to the public to protect it against foreseeable risk of danger attendant upon the maintenance and operation of his property (Wolk v. Pittsburgh Hotels Co. 284 Pa. 545, 131 A. 537, 42 A. L. R. 1081; Kapphahn v. Martin Hotel Co. 230 Iowa 739, 298 N. W. 901); and to keep it in such condition that it will not be of danger to pedestrians using streets adjacent thereto. Gore v. Whitmore Hotel Co. 229 Mo. App. 910, 83 S. W. (2d) 114.

The failure of a hotel owner and operator to take reasonable precautions to eliminate or prevent conditions of which he is or should be aware and which might reasonably be expected to be dangerous to the public may constitute negligence. Wolk v. Pittsburgh Hotels Co. *supra.* In Holly v. Meyers Hotel & Tavern, Inc. 9 N. J. 493, 495, 89 A. (2d) 6, 7, the Supreme Court of New Jersey has stated the rule this way:

"We accept the general doctrine that if the defendant hotel knew, or had reason to know, of the danger of injury to passers-by from the acts of its transient guests within the hotel, then it was under the duty to take reasonable steps to avoid such injury. See Wolk v. Pittsburgh Hotels Co., 284 Pa. 545, 131 A. 537, 42 A. L. R. 1081 (Sup. Ct. 1925); Gore v. Whitmore Hotel Co., 229 Mo. App. 910, 83 S. W. 2d 114 (Ct. App. 1935); Bruner v. Seelbach Hotel Co., 133 Ky. 41, 117 S. W. 373, 376 (Ct. App. 1909); 43 C. J. S., p. 1176 (1945); 28 Am. Jur., p. 636

(1940)."

The plaintiff contends that the act which caused the injury was foreseeable and that the defendants failed in their duty to exercise reasonable care to restrain their guests or to prevent the injury.

■ There are certain controlling principles of law which must be kept in mind in considering the merits of the plaintiff's claims as they are established by the record. It is recognized that one who assembles a large number of people upon his premises for the purpose of financial gain to himself assumes the responsibility for using all reasonable care to protect others from injury from causes reasonably to be anticipated.[1] In the exercise of this duty it is necessary for him to furnish a sufficient number of guards or attendants and to take other precautions to control the actions of the crowd.[2] Whether the guards furnished or the precautions taken are sufficient is ordinarily a question for the jury to determine under all of the circumstances.

■ The common-law test of duty is the probability or foreseeability of injury to the plaintiff. As expressed by Chief Judge Cardozo, "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Palsgraf v. Long Island R. Co. 248 N. Y. 339, 344, 162 N. E. 99, 100, 59 A. L. R. 1253, 1256; 13 Dunnell, Dig. (3 ed.) § 6973, note 25. In Restatement, Torts, § 348, the same rule is expressed with respect to liability of one who holds out his property for use of the public. It is said that in the exercise of reasonable care the owner of a public place has a "duty to police the premises" and to furnish a sufficient number of servants to afford reasonable protection "if the place is one or the character of the business is such that the utility or other possessor should expect careless or criminal third persons to be thereon either generally or at some particular time." Schubart v. Hotel Astor, Inc. 168 Misc. 431, 438, 5 N. Y. S. (2d) 203, 210.

■ For the risk of injury to be within the defendants' "range of apprehension," it is not necessary that the defendants should have had

---

[1]Pfeifer v. Standard Gateway Theater, Inc. 259 Wis. 333, 48 N. W. (2d) 505.

[2]Ibid.

notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the person of ordinary prudence.[3]

■ It should further be emphasized that, while the standard of care remains constant, the degree of care varies with the facts and circumstances surrounding each particular case. And, in considering the degree of care to be exercised by the defendants under the circumstances in the case before us, it is relevant to consider authorities dealing with the liability of hotelkeepers and bar operators.[4]

■ Since the defendants are not only hotel operators but are engaged as well in the sale of intoxicating liquor, it is material to point out that they are under the duty to use reasonable care to protect guests and patrons from injury at the hands of irresponsible persons whom they knowingly permit to be in and about the premises on which their business is conducted. In Mastad v. Swedish Brethren, 83 Minn. 40, 42, 85 N. W. 913, 914, 53 L. R. A. 803, 805, 85 A. S. R. 446, 448, we said:

"* * * All who engage in a public business of that nature are bound to protect their guests, both in person and property, from acts and misconduct of wrongdoers permitted to remain upon the premises; and the rules of law applicable to the common carrier are applicable alike to them."

See, also, Windorski v. Doyle, 219 Minn. 402, 18 N. W. (2d) 142; Priewe v. Bartz, 249 Minn. 488, 83 N. W. (2d) 116. Although it appears from the record that the defendants doubted the wisdom of permitting free liquor and beer to be served upon the premises, they nevertheless permitted it.

It is the policy of the law, both statutory and decisional, to protect the public from social consequences of intoxicating liquor. There is perhaps no field of business activity more hedged about with state and municipal laws and regulations designed to protect the public. When a

---

[3]Zurich General Acc. & Lia. Ins. Co. v. Childs Co. 253 N. Y. 324, 328, 329, 171 N. E. 391, 392, and cases there cited.

[4]28 Am. Jur., Innkeepers, §§ 54 and 55; Peck v. Gerber, 154 Ore. 126, 59 P. (2d) 675, 106 A. L. R. 996; 65 C. J. S., Negligence, § 45c; Weihert v. Piccione, 273 Wis. 448, 78 N. W. (2d) 757.

person engaged in that business permits crowds to gather upon his premises for profit, he must recognize the risks which flow from the nature of the business.

■ In the light of the foregoing observations we may examine the record for the purpose of determining whether or not the act causing the injury was within the range of foreseeability and, if so, whether the defendants exercised the required degree of care to protect the public from the consequences of such an act. Since the act causing the injury must be considered in the light of the circumstances and conditions under which it is alleged to have occurred, it should be observed that the defendants not only furnished room accommodations for from 350 to 400 delegates but also provided their rooms and facilities as headquarters for a convention attended by more than 4,000 young men. This use differed from the ordinary commercial business of the hotel in that its rooms and facilities were turned over to the convention for meetings, caucuses, and social purposes. An officer of the convention described the delegates as a group of young men who "work hard and * * * play hard." It may be expected that in the light of human experience the defendants were aware of the fact that among this number, as in any group of young men, would be a certain number not concerned with the serious work of the convention. It must have been apparent to the defendants that the ready availability of free intoxicants would not tend to repress the urges of this element. After the convention had been in session for several days, it came to the attention of the management of the hotel that the premises, both inside and out, had been littered with the debris of broken glasses and bottles. They became aware of the considerable damage to their property and received complaints from a pedestrian and policemen that water bags were being thrown from the hotel upon the sidewalk. The accumulated effect of these happenings was to the executive director of the hotel a "harrowing experience." This was all before the accident to the plaintiff occurred. That the dropping of objects from the hotel windows by certain of those occupying the premises was within the range of foreseeability is evidenced by the fact that the hotel company, prior to the convention, took the precaution of cutting the corners out of hotel laundry bags so as to

prevent their use as water containers. Moreover, it seems to us that in light of what had happened prior to the accident the management of the hotel must have been aware of the fact that in the indiscriminate throwing of glasses, bottles, and other objects in and about the hotel they might expect as part of that course of conduct that objects might be thrown from the windows to the sidewalk below. It is our view that these facts and circumstances presented a question for the jury to determine as to whether the negligent act which caused the plaintiff's injuries was within the defendants' range of foreseeability.

■ We turn next to inquire as to what precautions were taken by the defendants to protect the plaintiff as a member of the public from such foreseeable risk. It appears from the record that, after the hotel manager received the report that water bags had been dropped to the street, he said they patrolled the house and in rooms where they found "they were doing entertaining we told them to be careful about throwing out anything." He said that it wouldn't have done any good to try to find out the room from which the water bags were thrown, apparently for the reason that the convention was "out of control." He said the loss of control occurred every night "Any time after seven o'clock in the evening, from seven on." There is this testimony:

"Q. Would you say yes or no that it was the most harrowing experience you had as a hotel operator of that hotel?

"A. Well, I would say yes.

"Q. And isn't it true that you and the other officers of the hotel were all of that view even before the convention was over?

* * * * *

"A. Well, I would say, yes.

* * * * *

"Q. Now, is it true at the conclusion of this convention that you and the other members of the hotel management were shocked by the damage done to your premises during the course of this convention?

"A. Yes, we were."

The manager of the hotel was asked if, when Miss Connolly was injured, he did not say, "Well, here is another of those incidents. I will be glad when this * * * convention is over." He did not deny making

that statement and admitted that he might have made it because that was the way he felt at the time it happened. There is this testimony from the housekeeper:

"Q.   But when you have in combination in a matter of a couple days time mirrors broken, recessed lights in the hallway broken, permanent quiet signs attached to the wall torn off, when you have the exit lights damaged, when you have the hall fixtures damaged, when you have the screens damaged, as you described, when you have wash bowls torn off of the wall in the men's room, when you have doors kicked in, when you have mouldings torn off, when you have seven holes drilled into a door of the hotel, wouldn't you say that is a shocking experience over a two day period of time?

\* \* \* \* \*

"A.   Yes, I think it is.

"Q.   The like of which you had never seen before in that interval of time with any convention in that hotel.

"A.   That's right. It really is true."

The record establishes that the defendants made no complaint as to the conduct of the guests and invitees to any responsible official of the Junior Chamber of Commerce. Had one been made, it may be assumed that the officers of the convention could have controlled their own members. Neither did the management of the hotel complain to the authorities or ask for additional police protection. On the record we are satisfied that it was plainly a question for the jury to say whether under these unusual circumstances the defendants should have anticipated an accident such as happened and whether they should have taken some precautions by way of securing additional police or watchmen to supervise the conduct of their patrons. It is apparent from the record that, after the hotel management became aware of the disorderly character of the convention, it took no further affirmative action to protect the interests of the public. We are of the view that, once it became apparent to the defendants that the preliminary precautions which had been taken were not sufficient to protect the public from foreseeable risks which might arise from the disorderly character of the convention, the hotel had an affirmative duty to take further pre-

cautions to protect the public. Without undertaking to state precisely what precautions should have been taken by the defendants under the circumstances, we think that evidence of the defendants' failure to hire additional guards, to secure additional police protection, or to appeal to responsible officers of the convention presented a fact question as to whether the defendants exercised due care commensurate with the circumstances. The argument may well be advanced that by "turning the other cheek," to use an expression of the hotel's managing director, the defendants acquiesced in the misuse of their property and became for all practical purposes participants in such misuse.

■ The defendants further contend that there can be no liability to the plaintiff for the reason that she was neither an invitee nor patron of their establishment. They argue that they cannot be held liable for the unauthorized acts of a third person who, while on their premises, causes injury to an occupant of a public sidewalk. It may be briefly said that, even though the plaintiff was not a patron or a guest of the defendants, a relationship existed between them at the time and place of the injury which gave rise to a legal duty on the part of the defendants. That relationship imposed an affirmative duty upon the defendants to guard the public from danger flowing from the use of their property by their guests and invitees, even though that use was not authorized by the defendants. There was a duty on the part of the defendants to members of the public at large to protect them from injury by forces set in motion as a result of the use which the defendants permitted to be made of their property. Here the plaintiff was a pedestrian within her rights as an occupant of the sidewalk on a street adjacent to the defendants' hotel. There was evidence from which a jury could find that she was injured as a result of disorderly conduct upon the premises, the risk of which was foreseeable and in regard to which the defendants after notice failed to take measures to protect her as a member of the public. In Priewe v. Bartz, 249 Minn. 488, 491, 83 N. W. (2d) 116, 119, in discussing the rights of a patron of a 3.2 beer establishment we said that such a person "has a right to rely on the belief that he is in an orderly house and that its operator, personally or by his delegated employee, will exercise reasonable care 'to the end that the doings in

the house shall be orderly.' " By the same token it may be said that a pedestrian using a sidewalk adjacent to a hotel where intoxicating liquor is sold and dispensed may assume that the owner will exercise reasonable care to the end that the acts and conduct permitted upon the property will not expose a member of the public to the risk of bodily harm.

■ The conclusions we reach are supported by respected authority. In Gore v. Whitmore Hotel Co. 229 Mo. App. 910, 83 S. W. (2d) 114, a pedestrian was injured in an accident resulting from the throwing of a paper bag containing water from an upper floor of the defendant hotel while a convention of the Veterans of Foreign Wars was in progress. The manager of the hotel admitted that objects had been thrown from the hotel on every night of the convention. It was the contention of the defendant that in order to impose liability it was necessary to establish that the proprietor of the hotel had reason to foresee that the object would be dropped or thrown so that the proprietor would have notice and an opportunity to exercise reasonable care to prevent the occurrence; that the guests to whom the defendant had assigned rooms were entitled to courteous treatment; and that the defendant had no right of access to the rooms of guests. The court held, however, that the guests were under a duty to refrain from unlawful and disorderly conduct which endangered the safety of others; that a willful violation of that duty forfeited the right of the guest to possession of the room; and that when the defendant became aware of the existence of the disorderly conduct of the guest it was its duty to exercise reasonable care to abate the condition. There, as here, there was no evidence to identify the particular room from which the object was thrown. Nevertheless, the court held that it was the duty of the defendant in the exercise of reasonable care to identify the offenders and the rooms used by them in the perpetration of the wrong. In that case the house officer had checked various rooms occupied by the guests and made inquiry as to whether or not they had thrown water into the streets. The night manager also went across the street and watched windows of the hotel but could not identify any of the rooms from which the objects were thrown. The court there said (229 Mo. App. 916, 83 S. W. [2d] 118):

"The mere failure of defendant to exercise ordinary care to identify the rioters was not sufficient to fix liability upon it. The defendant was not liable unless it could by the exercise of ordinary care have abated the condition in time to have prevented the injury to plaintiff. The evidence was sufficient to allow the jury to find that the defendant, though it had the right to evict the wrongdoers, negligently failed to identify them and, hence, never attempted to exercise such right. Having the legal right to evict the offenders, this court cannot say as a matter of law that the defendant could not by the exercise of reasonable care have enforced this right prior to the time plaintiff was injured. The question was one for the jury."

See, also, Weihert v. Piccione, 273 Wis. 448, 78 N. W. (2d) 757; Pfeifer v. Standard Gateway Theater, Inc. 259 Wis. 333, 48 N. W. (2d) 505; Fortier v. Hibernian Bldg. Assn. 315 Mass. 446, 53 N. E. (2d) 110; Southern Enterprises, Inc. v. Marek (Tex. Civ. App.) 68 S. W. (2d) 384. Admittedly under the facts in the Gore case there were more frequent incidents of objects having been thrown from the hotel by its occupants. But it does not seem to us that the duration or frequency of the disorderly acts is determinative. The issue is whether the proprietors of the hotel had notice of the disorderly behavior of their guests and, after having had such notice, whether they took such steps as a person of ordinary prudence would take to protect others from foreseeable hazards resulting from the disorderly conduct of their guests.

We think the authorities relied upon by the defendants may be distinguished. Wolk v. Pittsburgh Hotels Co. 284 Pa. 545, 131 A. 537, 42 A. L. R. 1081, where it was held that an innkeeper is not liable for injuries caused by a transient guest's placing of objects on a window sill, which objects fell to the street injuring a person in an automobile, and Larson v. St. Francis Hotel, 83 Cal. App. (2d) 210, 211, 188 P. (2d) 513, 514, where a pedestrian was injured when a guest of the defendant hotel as "the result of the effervescence and ebullition of San Franciscans in their exuberance of joy on V-J Day" tossed an armchair out of a hotel window, may be distinguished in that they deal with instances of sporadic or isolated acts of which the owner did not have notice and in regard to which he had no opportunity to take steps to

remove the danger. We think that Holly v. Meyers Hotel & Tavern, Inc. 9 N. J. 493, 89 A. (2d) 6, may also be distinguished. Under the facts in that case the court concluded (9 N. J. 496, 89 A. [2d] 7): "* * * there was no occasion for any affirmative action" during the 2-hour period between the time the guests of the hotel who were responsible for the accident were warned by the hotel management and the time the accident occurred. These cases do not deal with facts establishing a course of disorderly conduct continuing over a period of days and under circumstances where the defendants admitted that they had lost control of the orderly management of their property and failed to do anything about it.

■ The defendants contend that the proof is circumstantial and that there is no evidence that the object which struck the plaintiff came from the hotel. The plaintiff was struck in the eye by a mass of moist dirt or earth. The jury could find that this object was not an accumulation of dirt which fell from the structure. The record indicates that periodic inspections were made of the exterior of the building so that there would be no sizeable collection of dirt on it. Nor was it likely that the mass of dirt or earth came from some other building. From the physical location of the place where the accident occurred and the surrounding structures, there was ample evidence from which the jury could find that the place from which the mass of dirt or earth came would be the Nicollet Hotel property. The record before us indicates that the Nicollet Hotel is a 12-story structure. The accident occurred approximately 100 feet from Washington Avenue and 100 feet from the garage entrance south of the hotel. Across the street from the hotel on Nicollet Avenue are two 4-story buildings. Nicollet Avenue is 50 feet in width. There was nothing unusual about the weather conditions and no evidence of a wind which might carry a mass of mud from a distant source. There is no evidence to indicate that the mass of mud came from a vehicle or other pedestrian. We think that under the facts in this case the evidence presents inferences which make the question of where the mass of mud came from one for the jury.

We have said many times that the law does not require every fact and circumstance which make up a case of negligence to be proved by

direct and positive evidence or by the testimony of eyewitnesses, and that circumstantial evidence alone may authorize a finding of negligence. Negligence may be inferred from all the facts and surrounding circumstances, and where the evidence of such facts and circumstances is such as to take the case out of the realm of conjecture and into the field of legitimate inference from established facts, a prima facie case is made. Standafer v. First Nat. Bank, 243 Minn. 442, 448, 68 N. W. (2d) 362, 366; 38 Am. Jur., Negligence, § 333; Westling v. Holm, 239 Minn. 191, 58 N. W. (2d) 252.

Reversed.

THOMAS GALLAGHER, JUSTICE (dissenting).

1. The question presented is whether defendant should have reasonably anticipated that someone would throw or drop some substance from a window on the Nicollet Avenue side of the hotel shortly after midnight the last day of the convention and whether it had taken reasonable precautions to prevent such conduct.

It is well settled that an innkeeper is liable to third persons for the act of a guest only where he knew, or by the exercise of ordinary care could have known, that the guest was likely to do some act that would result in injury to such third person. 28 Am. Jur., Innkeepers, § 138; Annotation, 42 A. L. R. 1088. The duty rests upon him to protect such persons from foreseeable risks attendant upon the maintenance and operation of the property and to exercise reasonable care to keep it in such condition so as not to endanger them. He is not required to guard against every conceivable or possible danger, but only against those which appear reasonably probable. Kapphahn v. Martin Hotel Co. 230 Iowa 739, 298 N. W. 901; Gore v. Whitmore Hotel Co. 229 Mo. App. 910, 83 S. W. (2d) 114; Wolk v. Pittsburgh Hotels Co. 284 Pa. 545, 131 A. 537, 42 A. L. R. 1081; Holly v. Meyers Hotel & Tavern, Inc. 9 N. J. 493, 89 A. (2d) 6.

2. When plaintiff was injured shortly after midnight, the convention had been in progress for 3 days and had reached its final stages. It had been quite disorderly. There is testimony that on previous days some of the guests had thrown or dropped ice cubes and in one instance a screen from the upper windows of the hotel. There is no evidence that

acts of this kind had been a continuous practice during the convention, or that they had been engaged in at all on the day of plaintiff's injury. There is no evidence that defendant knew that any such misconduct was taking place just prior to the time of the occurrence involved. Defendant had retained two men regularly employed at the hotel and had six more men to patrol its corridors and prevent disorders during the convention. In addition the convention corporation had employed two men for this purpose, and the police of the city continued to maintain a regular 24-hour beat on the sidewalks adjacent to the hotel. During previous days of the convention, when defendant's manager had been notified that objects had been thrown from hotel windows, he had promptly checked the rooms in which he suspected such misconduct was occurring, but in each instance their occupants had denied that anyone therein had been guilty of the offenses described.

3. It is difficult to speculate as to what further precautions should reasonably have been required of defendant without making it an absolute insurer. Obviously, it could not direct its employees to enter guest rooms at random or to remain therein to prevent possible misconduct when it lacked evidence that any misconduct was occurring or was contemplated by room occupants. Not only would such procedure deprive guests of room privileges for which they had paid, but, if carried to its logical conclusion, it would require that defendant, to be exonerated from any claim of negligence, employ and station a guard in every convention guest room of the hotel during the entire convention. As stated in Larson v. St. Francis Hotel, 83 Cal. App. (2d) 210, 213, 188 P. (2d) 513, 515:

"* * * The most logical inference * * * is that the chair was thrown * * * from a window. * * * this occurrence is not such as ordinarily does not happen without the negligence of the party charged, but, rather, one in which the accident ordinarily might happen despite the fact that the defendants used reasonable care and were totally free from negligence. To keep guests and visitors from throwing furniture out windows would require a guard to be placed in every room in the hotel, and no one would contend that there is any rule of law requiring a hotel to do that."

4. The situation here is distinguishable from that in Gore v. Whitmore Hotel Co. 229 Mo. App. 910, 83 S. W. (2d) 114, where convention guests had thrown placards, feathers, telephone books, pillows, water-filled sacks, laundry bags, and like items from hotel windows for 3 days in a "regular deluge"; and from that in Pfeifer v. Standard Gateway Theater, Inc. 259 Wis. 333, 48 N. W. (2d) 505, where, for some time prior to plaintiff's injury, objects were being thrown about a theater and the theater owner had done nothing to stop such misconduct.

5. The majority opinion recites a number of acts of misconduct on the part of the convention guests which seem to be entirely irrelevant to the issue to be determined. The fact that on a previous day, following the convention parade, beer bottles and beer cans had been left on the sidewalk adjacent to the Hennepin Avenue side of the hotel is not evidence that such articles had been thrown or dropped from the hotel windows. The same is true as to beer bottles and beer cans placed upon the third-floor fire escape on the day prior to the accident. Evidence of objects being dropped or thrown from the hotel on two or three isolated occasions is far from evidence of a deluge which might require prompt and positive preventative measures by a hotel proprietor as in Gore v. Whitmore Hotel Co. 229 Mo. App. 910, 915, 83 S. W. (2d) 114, 117. An animal mascot in the hotel lobby and others on an upper floor of the hotel; broken glass on the sidewalk near the garage; and the firing of guns in the hotel lobby bear no relationship to defendant's obligation to use reasonable care to prevent articles from being thrown from its upper windows. Evidence of wet carpets, broken chairs, broken screens, and soiled walls inside the hotel, all resulting from misconduct on the part of convention guests, is likewise totally unrelated to the issue to be determined here.

6. It is suggested that *all* such factors might support a finding of negligence based upon defendant's failure to "properly police the premises" or to "furnish a sufficient number of servants to afford reasonable protection." As pointed out above, to satisfy such a requirement would impose upon a hotel owner the obligation of stationing a guard in each room in which a convention guest was quartered so that its occupants might be kept under constant surveillance day and night.

Such is not the obligation which has been imposed upon innkeepers or hotel owners by any decision on this subject. As stated in Bruner v. Seelbach Hotel Co. 133 Ky. 41, 49, 117 S. W. 373, 376, where a hotel owner was absolved from liability for the action of a guest in throwing a beer bottle into the street:

"* * * It is only when they [the hotel owners] know, or by the exercise of ordinary care could know, that the guest's conduct is such that injury will naturally result to others, that they have the right to eject the guest, or take precautions to control his conduct."

The rule of conduct prescribed by the majority opinion would seem to eliminate any possibility of an innkeeper or hotel owner escaping the charge of negligence in connection with any injuries which might occur during a hotel convention regardless of any reasonable care or precautions taken by them.

MATSON, JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Thomas Gallagher.

KNUTSON, JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Thomas Gallagher.